IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

REBECCA SEELYE                                              Case No. 2:24-cv-01139-HL

                    Plaintiff,                              **OPINION AND
                                                            ORDER**

        v.

COMMUNITY COUNSELING
SOLUTIONS,

                    Defendant.

_____

HALLMAN, United States Magistrate Judge:

        Plaintiff Rebecca Seelye ("Plaintiff") brings this action against Defendant Community

Counseling Solutions ("Defendant"), alleging that Defendant violated state and federal laws

protecting disabled workers when it terminated her employment. Compl., ECF 1. Now before the

Court is Defendant's Motion for Summary Judgment. Def.'s Mot. for Summ. J. ("Mot."), ECF

34. For the reasons that follow, Defendant's Motion is GRANTED in part and DENIED in part.

Plaintiff's employment discrimination and retaliation claims under the Americans with

Disabilities Act ("ADA"), the Oregon Rehabilitation Act ("ORA"), and retaliation under the

Oregon Family Leave Act ("OFLA") present genuine issues of material fact that cannot be

resolved on summary judgment. But Defendant is entitled to summary judgment on Plaintiff's

PAGE 1 – OPINION AND ORDER

hostile work environment theory for liability under the ADA and ORA, her Family and Medical Leave Act of 1993 ("FMLA") claim, her OFLA interference claim, and her Oregon common law wrongful termination claim.

## BACKGROUND

When evaluating Defendant's Motion, this Court construes the facts—and the reasonable inferences that may be drawn from them—in the light most favorable to Plaintiff as the nonmoving party. *See Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011) (setting forth the standard for a court reviewing the record when evaluating a motion for summary judgment).[1]

### I.    The Parties.

Plaintiff qualified for Social Security disability benefits in 2011 after experiencing health problems over the preceding years. *See* Rebecca Seelye Decl. ("Seelye Decl.") ¶¶ 6–11, ECF 43. In 2012, she was diagnosed with diabetes and hypoglycemia. *Id.* at ¶ 12.

Defendant is an organization "headquartered in Heppner, Oregon" that "provides behavioral health services to five counties in Oregon." Lindsay Decl. ¶ 2, ECF 37. Those services include individual, family, and group therapy; substance abuse treatment; crisis

---

[1] Defendant identifies several purported shortcomings and deficiencies with the evidence submitted by Plaintiff. *See* Def.'s Reply 11–17, ECF 53. This Court limits its discussion to those portions of the declarations that would be admissible at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (explaining that, at summary judgment, a court focuses on the admissibility of the content rather than the form of the evidence). And although clear and unambiguous contradictions may lead to self-serving statements being stuck from an affidavit, a "non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony." *Relloque v. City of West Linn*, No. 3:22-cv-1781-SI, 2025 WL 919443, at *4 (D. Or. March 26, 2025) (citing and quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009)). Having considered Defendant's objections to Plaintiff's Declaration, the Court finds that any identified discrepancies—to the extent that they are incorporated here—do not establish a clear and unambiguous inconsistency. Such discrepancies may be properly weighed by the factfinder, which at summary judgment, is not this Court.

intervention services; psychiatric consultation; and medication management. *Id.* Defendant had over 300 employees at the time of the events in this action. Bastian Decl. Ex. 25 ("Fuentes Dep.") 102:6–10, ECF 42. And Defendant operated multiple offices in different locations in eastern Oregon. *See, e.g.*, Bastian Decl. Ex. 30 ("Worden Dep.") 40:21–41:14 (listing locations in Hermiston, Boardman, and Fossil).

## II.    Plaintiff's application and initial employment with Defendant.

In the fall of 2020, Plaintiff "saw a job posting for a part-time office support specialist" role with Defendant and applied for it. Seelye Decl. ¶ 18. During the application and interview process with Defendant, Plaintiff informed Defendant's employees that she had a disability. *Id.* at ¶ 19. Specifically, she informed the interview panel that she "had multiple disabilities, including [d]iabetes and low blood sugar." *Id.* The panel consisted of Lindsay McKnight, the human resources ("HR") manager; Lisa Helms, a mental health therapist; and Cindy Fuentes, the office support supervisor. *Id.* The panel did not ask her questions about her disabilities or need for accommodations, but Ms. McKnight "reiterated that the position was for a part-time Office Support Specialist." *Id.* And Plaintiff responded that "having a part-time job would be best for [her]," because (1) she "would get sick if [she] worked too many hours" and (2) was limited in the number of hours she could work due to her Social Security disability benefits. *Id.*

On November 10, 2020, Plaintiff received a letter from Ms. McKnight offering her "a part-time office specialist position in" Defendant's Arlington, Oregon office. *Id.* at ¶ 20; *see also* Coles Decl. Ex. F at 7–8, ECF 35-1 (showing the offer letter). And in December 2020, Plaintiff reported to Defendant's Boardman office for training. Seelye Decl. ¶ 21. During that one-month training, Plaintiff learned "how to schedule clients on the computer, handle telephone calls, use various forms and processes, register new clients, and verify insurance." *Id.* She also learned to

take patient vitals. *Id.* at ¶ 22. Plaintiff asserts that the need for office support specialists "to take vitals was particular to the Boardman location" because those patients were "scheduled to have therapy sessions" with a psychiatrist who worked remotely from Portland, Oregon. *Id.*

Plaintiff received a formal offer letter on January 7, 2021, from Ms. McKnight, and Plaintiff signed the letter on March 16, 2021. *Id.* at ¶ 23; *see also* Coles Decl. Ex. F at 1–2. The written job description for the office support specialist position included the following responsibilities:

- Schedule clients for appointments, *assist in the completion of intake paperwork when necessary, obtain completed intake paperwork*, communicate with and collect fees from clients, explain fees to clients, obtain insurance information for billing purposes, enter data into computer system database.
- *Deal effectively and in a friendly manner with all patrons and employees in person and by phone, and direct calls and individuals to proper sources; answer inquiries and provide correct general program information to the public and clients; communicate with community agencies effectively*, provide information, referrals, etc.
- Ensure on call crisis schedules and changes are communicated to dispatch.
- *Route crisis calls or walk-ins to appropriate crisis clinician.*
- Maintain agency and clinical forms files and supply of new client files. Copy client files as needed. Maintain clinician schedules via use of computer scheduling. Ensure entry into billing system of contracted or non-clinical services.
- Interpret client accounts and explain this information to client.
- Prepare receipts for client payments and post payments as directed.
- *Obtain vital signs on patients for doctors.*
- Record changes of information for client records. Complete authorizations to share and exchange information.
- Review all requests for protected health information to determine if they are allowable under HIPAA.
- Perform word processing to prepare all office forms with reasonable speed and accuracy.
- *Administer forms for urinalysis testing (UA's), provide accurate information on the UA's to clients*, in some cases observes the UA, and record all pertinent information.
- *Handle multiple phone lines with voice mail system on a daily basis. Route calls to appropriate clinician.*
- *Purchasing of non-capital items.*
- Assist in the training of new Office Support specialists as needed.
- *Inventory office supplies.*

PAGE 4 – OPINION AND ORDER

- *Receive freight and inventory* according to internal controls.
- *Mail correspondence, and pick up and distribute mail.*
- File documents in client files. Purge files when statute of limitations has expired.
- Perform and participate in agency financial controls as directed.
- Maintain office equipment, ensuring that equipment is in working order. Assist staff in troubleshooting problems.
- Submit reports to the state, GOBHI and other agencies as required.
- Gather and distribute information as requested by the Office Manager or Business Operations Manager (i.e. timesheets, purchase requests, and other office forms).
- *Responsible for opening the front office for business and closing the front office to ensure the security of confidential information.*
- *Acts as a back-up for other Office Support Specialists as needed.*
- Other duties as assigned.

Coles Decl. Ex. F. at 3–4 (emphasis added).[2]

Defendant assigned Plaintiff to its Arlington office in January 2021 after she completed her training. Seelye Decl. ¶ 23. That office was a 45-minute drive from Plaintiff's home, and there was no public transportation that she could use. *Id.* at ¶ 24. Plaintiff's schedule was Monday through Friday, from 8:00 AM to 12:00 PM. *Id.* at ¶ 29.

Defendant's Arlington office "was attached to the Arlington Clinic, a medical facility." *Id.* at ¶ 25. The office's "waiting room could seat only two people," and the "Arlington Clinic accepted UPS packages." *Id.* The room where patients were seen at the Arlington office "resembled a break room." *Id.*

There were two mental health professionals who were regularly assigned to the Arlington office. *Id.* at ¶ 32. Damon Holland saw clients in the office on Mondays beginning at 7:00 AM. *Id.* Mr. Holland worked in a different office the remainder of the week. *Id.* Malia Mattingly worked in the Arlington office on Tuesdays, Wednesdays, and Thursdays. *Id.* She worked in a different office on Fridays. *Id.* But Ms. Mattingly

---

[2] Defendant's Motion highlights several of these responsibilities, *see* Mot. 5–6, and the Court emphasizes them accordingly. But for completeness, this Court also includes all the listed responsibilities that are reflected in the record.

PAGE 5 – OPINION AND ORDER

subsequently moved to California, where she worked remotely for Defendant. *Id.* at ¶¶ 32, 38, 69.

Plaintiff "was generally the person that opened the [Arlington] office," Coles Decl. Ex. A ("First Seelye Dep.") 73:3–9, ECF 35-1, unless one of the therapists working there had already unlocked the door, *see* Seelye Decl. ¶ 25. When Plaintiff "left the office at noon, [she] did not lock it, except on Fridays at noon, when [she] sometimes locked it if no one was using it." *Id.*; *see also id.* at ¶ 33 (explaining the Mr. Holland preferred that Plaintiff lock the door when she left on Mondays, and Ms. Mattingly directed her to leave the door unlocked when she left). If clients arrived in the afternoon, they would enter the office if it was unlocked and waited until their appointment began. *Id.* at ¶ 33. Therapists locked the door when they left at night. *Id.*

Plaintiff asserts that she had no physical tasks to perform with clients, although she acknowledges that she may have taken a patient's vitals on one or two occasions. *Id.* at ¶ 35; First Seelye Dep. 76:11–77:2. A therapist would escort clients into the consultation room for their appointments. *Id.* at ¶ 35. Client appointments were entered into a computerized scheduling system. *Id.* at ¶ 39. But Plaintiff was limited in her communications with clients: She was instructed to only answer questions related to scheduling, fees, and office hours; and she was asked few questions. *Id.* at ¶¶ 40, 43. She received calls forwarded from a central location to her personal phone. *Id.* at ¶ 41. And client payments were made via check and mailed to a separate office. *Id.* at ¶ 42. Plaintiff never had a person come into the office in crisis for emergency services. *Id.* at ¶ 43.

Plaintiff completed other tasks using her computer. *Id.* at ¶ 44. She completed records of the services that the Arlington office was providing. *Id.* During that period,

PAGE 6 – OPINION AND ORDER

Medicare audits of the office were completed online. *Id.* And the Arlington location was audited twice during that time. *Id.*

"On a few occasions, [Plaintiff] was assigned to work at Defendant's other offices." *Id.* at ¶ 31. On those occasions, the Arlington office was unstaffed. *Id.*

### III.    The impact of Plaintiff's health on her employment in 2022.

Plaintiff continued receiving Social Security Disability Insurance ("SSDI") benefits while working part-time for Defendant, and the Social Security Administration sent her a questionnaire that was completed by Ms. Fuentes. *See* Seelye Decl. ¶ 46; *see also* Fuentes Decl. Ex. A, ECF 36-1.

On December 3, 2021, Plaintiff missed work due to a worsening of her diabetic symptoms, and she notified Ms. Fuentes. Seelye Decl. ¶ 47. In February 2022, Plaintiff's illness worsened further, and—at the order Dr. Sarah Ulrich—she was "taken off work for six weeks." *Id.* On March 1, she received emergency treatment for her diabetic condition, and Dr. Geoffrey Thomas recommended that she not work until March 5, 2022. *Id.* at ¶ 48; *see also* Bastian Decl. Ex. 2, ECF 42 (showing text exchange between Ms. Fuentes and Plaintiff about her condition and the note from Dr. Thomas).

On March 8, Hanna Rinehart—one of Defendant's human resources representatives—emailed Plaintiff an FMLA and OFLA form and asked her to complete it. Seelye Decl. ¶ 48; Bastian Decl. Ex. 3, ECF 42. Plaintiff completed that form and submitted it to Ms. Rinehart. Seelye Decl. ¶ 48; Bastian Decl. Ex. 4, ECF 42. But upon review, Ms. Rinehart concluded that Plaintiff was ineligible for either program because she had not worked enough hours over the previous 12 months. Seelye Decl. ¶ 49; Bastian Decl. Ex. 5 at 1, ECF 42 (nothing that Plaintiff only worked 20 hours per week).

Ms. Rinehart notified Plaintiff that she did not qualify for FMLA or OFLA but advised her that she could request leave-without-pay ("LWOP") from her supervisor. Lindsay Decl. Ex. A at 5, ECF 37-1

On March 24, Plaintiff emailed Ms. Fuentes and requested LWOP due to her medical conditions. Lindsay Decl. Ex. A at 2–3. Ms. Fuentes discussed the request with Kimberly Lindsay, Defendant's Executive Director. *Id.* at 2; *see also* Lindsay Decl. ¶ 1, ECF 37. Ms. Fuentes told Ms. Lindsay that there was coverage for Plaintiff's position while she took leave. Lindsay Decl. Ex. A at 1. Christine Gray, Defendant's HR Director, expressed that she had no concerns about Plaintiff's LWOP status. *Id.*; *see also* Lindsay Decl. ¶ 6. Ms. Fuentes notified Plaintiff that her LWOP status was confirmed on April 5. Bastian Decl. Ex. 6, ECF 42.

On May 10, Plaintiff notified Ms. Fuentes that her doctor had cleared her to return to work but only if she could work from home without driving to the Arlington office. Fuentes Decl. Ex. B at 1–2, ECF 36-1. Ms. Fuentes responded that Plaintiff should send the request to HR to ask whether it was something Defendant could accommodate. *Id.* But when Plaintiff notified HR, Ms. Rinehart told her that she should work with Ms. Fuentes "on what [she] could do at home and for how long." Bastian Decl. Ex. 8 at 2–3, ECF 42. In a separate email, Ms. Rinehart told Ms. Fuentes that because it was a medical condition, HR would approve it, and Ms. Fuentes should ensure that Plaintiff had work to do. *Id.* at 1–2. Ms. Fuentes responded that she was working on a list of duties that Plaintiff could complete from home and was coordinating with Plaintiff. *Id.* at 1.

On May 11, Rick Worden, Defendant's Chief Financial Officer, and Ms. Fuentes approved Plaintiff's request to work from home. Seelye Decl. ¶ 55. Ms. Fuentes told

PAGE 8 – OPINION AND ORDER

Plaintiff to bring supplies to her home so that she could work, and Plaintiff "brought home a laptop computer and a printer/scanner/copier." *Id.* Plaintiff—per Ms. Fuentes' instruction—began working from home on May 13. *Id.* Plaintiff asserts that she "did not propose [her] request to work from home as a temporary accommodation nor did [her] employer place an end date on the accommodation" when it was granted. *Id.*

While working from home, Plaintiff had a dedicated home office, safeguards to protect client confidentiality, and otherwise maintained the same office hours as she did when working in-person at the Arlington office. *Id.* at ¶ 57. As before, Plaintiff completed her work using her computer and personal phone. *See id.* at ¶¶ 41–42, 44, 57–58. Plaintiff received calls forwarded by Defendant on her personal phone, and she answered clients' basic questions about scheduling, fees, and office hours. *Id.* at ¶¶ 40, 57. Clinicians opened and closed the Arlington office as needed, and they scanned and emailed client paperwork to Plaintiff. *Id.* at ¶ 58. Plaintiff then "processed the paperwork, contacted clients if any information was missing, and scheduled them" accordingly. *Id.*

While working from home, Plaintiff and Defendant's employees communicated about how her employment impacted her eligibility for SSDI benefits. *See* Bastian Decl. Ex. 10, ECF 42. And Ms. Fuentes and Ms. Rinehart worked with her to ensure that she maintained her eligibility for those benefits while also remaining an employee. *See id.*

Ms. Fuentes completed a performance evaluation for Plaintiff on July 11. Bastian Decl. Ex. 11, ECF 42. Plaintiff received "exceeds expectations" or "meets expectations" in each of the categories. *See id.*; *see also* Seelye Decl. ¶ 60. When discussing Plaintiff's attendance, the review noted that she had dealt with some health issues, but it also praised her as "the best office person we have ever had in Arlington" and noted that her "being

able to work from home has been [a] tremendous help." Bastian Decl. Ex. 11 at 3–4. The

review indicated that there were no performance issues with Plaintiff's work. *Id.* at 6.

**IV.    The impact of Plaintiff's health on her employment in 2023 and her subsequent termination.**

"On February 14, 2023, Providence Portland Medical Center admitted [Plaintiff]

for a fasting test." Seelye Decl. ¶ 61. Plaintiff's health subsequently worsened. *Id.* And on

February 27, Plaintiff notified Defendant "of [her] need to take a leave of absence

beginning on February 22, 2023" until she was cleared to return. Lindsay Decl. Ex. B,

ECF 37-1.

On March 7, Plaintiff's doctor provided a letter requesting that Plaintiff be

excused from work from March 7, 2023, to May 1, 2023, due to her medical condition.

Bastian Decl. Ex. 12, ECF 42. And on March 16, Plaintiff requested LWOP on an

indefinite basis while she managed her health issues and doctors' appointments. Lindsay

Decl. Ex. C, ECF 37-1; *see also* Lindsay Decl. Ex. C, ECF 55-1.[3] Ms. Lindsay approved

LWOP status through March 24, but she also noted that Defendant was "typically unable

to accommodate leave for extended periods that is not protected by FMLA/OFLA." *Id.*

Accordingly, Ms. Lindsay explained that she needed to discuss Plaintiff's request with

Ms. Gray and Mr. Worden. *Id.*

---

[3] Plaintiff contested the authenticity of Ms. Lindsay's reply email, which was included as part of the exhibit. Seelye Decl. ¶¶ 63–64. Ms. Lindsay's subsequent declaration, Lindsay Decl. ¶ 11, ECF 55, which was submitted in support of Defendant's Reply, re-attests to the email's authenticity and explains the formatting discrepancy identified by Plaintiff. Although Plaintiff states that she did not see Ms. Lindsay's email, this Court finds that Ms. Lindsay's declarations serve to properly authenticate the email chain. *See* Fed. R. Evid. 901(b)(1); *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773–74 (9th Cir. 2002) (discussing Fed. R. Evid. 901(a) and the requirements for a document to be considered in a motion for summary judgment).

Ms. Gray called Plaintiff to discuss her leave request on March 27. Seelye Decl. ¶ 65. Ms. Gray notified Plaintiff that she was ineligible for FMLA or OFLA because she had not worked enough hours. *Id.*; *see also* Bastian Decl. Ex. 13, ECF 42 (showing a copy of a letter from Jasmine Collin, a Human Resources Assistant, to Plaintiff notifying her that her leave of absence was denied because it did not meet the requirements under the FMLA). Plaintiff asserts that Ms. Gray suggested that she could "apply for long-term disability or agree to medical separation." Seelye Decl. ¶ 65. Plaintiff asserts that Ms. Gray told her that there were no other avenues to protect her job while she was off work. *Id.* Plaintiff then requested to finish the conversation at another time. *Id.* After that conversation, Plaintiff sent a message to her doctor requesting that she be released to return to work because she was concerned about losing her job. Coles Decl. Ex. G ("Seelye Second Dep.") 21:17–22:6, ECF 35-1. Plaintiff requested that her doctor stipulate that she continue to not drive, which was based on recommendations from her primary care doctor and endocrinologist. *Id.* at 22:3–18. Although Plaintiff's doctor agreed to provide that release, Plaintiff subsequently requested that her doctor disregard her request. *Id.* at 22:19–25.

On March 28, Ms. Gray sent the email chain from 2022 regarding Plaintiff's prior LWOP request to Ms. Lindsay and Mr. Worden. Bastian Decl. Ex. 15, ECF 42. She informed them that she was reviewing how much time off Plaintiff had previously taken under the LWOP arrangement. *Id.*

On March 29, Ms. Gray requested additional information from Plaintiff's doctor about his recommendation that Plaintiff be excused from work. Seelye Decl. ¶ 66; Bastian Decl. Ex. 14 at 1–3, ECF 42 (showing the faxed request for additional

PAGE 11 – OPINION AND ORDER

information). Ms. Gray also spoke to Plaintiff to notify her that she would request information from her doctor. Seelye Decl. ¶ 66. Plaintiff asked whether her absence from work was covered under the ADA, and Ms. Gray stated that she would research that. *Id.* Plaintiff subsequently sent a letter to Ms. Lindsay outlining her conversations with Ms. Gray and expressing concern about how her request was being handled. Bastian Decl. Ex. 16, ECF 42.[4]

Plaintiff and her doctor completed the paperwork requested by Ms. Gray on April 18. *Id.* at ¶ 68; Coles Decl. Ex. I at 5–7, ECF 35-1. Her doctor noted that Plaintiff needed time off work until May 1 to allow the medication to work. Cole Decl. Ex. I at 7. On April 21, Ms. Gray reached out to Plaintiff and others to schedule a meeting to discuss Plaintiff's request. Bastian Decl. Ex. 18, ECF 42. And on April 26, Plaintiff's doctor provided her with a note recommending that she avoid driving and continue working from home. Seelye Decl. ¶ 68; Bastian Decl. Ex. 17, ECF 42.

Plaintiff attended a virtual meeting with Mr. Worden and Ms. Gray on April 26. Seelye Decl. ¶ 69. Ms. Gray told Plaintiff that her request for LWOP was "covered." *Id.* And Ms. Gray stated that Plaintiff was cleared to work and return to the office as of May 1, 2023. *Id.* But when Plaintiff asked whether she could continue working from home, Ms. Gray stated that she was unaware that Plaintiff worked from home. *Id.* Plaintiff told her that she had been working from home for approximately one year and also noted that Malia Mattingly—a healthcare provider at the Arlington office—had been working

---

[4] Although the letter is dated March 30, 2023, it references events occurring in early April. *See* Bastian Decl. Ex. 16.

PAGE 12 – OPINION AND ORDER

remotely from California. *Id.* Ms. Gray informed Plaintiff that she would review whether Plaintiff could work from home. *Id.*

Ms. Gray called Plaintiff on April 28. *Id.* at ¶ 70. She told Plaintiff that she could not return to work if she needed to work from home. *Id.* But she told Plaintiff that she needed additional information about her work accommodation and that she needed to speak with Plaintiff's doctor. *Id.*

On May 1, Plaintiff emailed Ms. Gray about returning to work. *Id.* at ¶ 72. Plaintiff received a letter from Ms. Gray asserting that she could not return to work because she was unable to drive, and it was not the company's responsibility to transport her to and from work. *Id.* Ms. Gray stated that the review of Plaintiff's accommodation would continue. *Id.*

On May 11, Komal Tekchandani, a medical records specialist, completed paperwork regarding Plaintiff's short term disability benefits. Bastian Decl. Ex. 21, ECF 42. That paperwork noted that Plaintiff should not drive or operate heavy machinery for one year given her condition. *Id.* at 2. Physician notes included in that paperwork stated that Plaintiff could continue to work but should do so from home because she should not drive for an indefinite period. *Id.* at 4. Plaintiff asserts that—around this time—her condition began improving. Seelye Decl. ¶ 73. And she was prescribed a new medication for her condition after a May 25 visit with her doctor. Coles Decl. Ex. B at 20, ECF 54-1.

On May 26, Plaintiff received a call from Ms. Gray and Ms. Fuentes. Seelye Decl. ¶ 74. Ms. Gray informed her that she was being terminated from her position because she was unable to perform the essential duties of her position. *Id.*; *see also* Coles Decl. Ex. O ("Termination Letter"), ECF 35-1. The letter that was read to Plaintiff during the call

PAGE 13 – OPINION AND ORDER

acknowledged her doctor's recommendation to work from home. Termination Letter at 1. It stated that—although Plaintiff had previously been allowed to temporarily perform some of her duties from home—Defendant was unable to provide that option on a regular basis. Termination Letter at 1. The letter stated that Plaintiff "would be unable to perform the essential duties of [her] job which requires [her] personal attendance and performance of the job at the office." *Id.* It also noted that her doctor's restriction on driving was indefinite and that she did not have rights to protected leave. *Id.* Finally, the letter stated that Defendant did "not find there to be any effective, reasonable accommodation available, (including an unpaid leave of absence for an indefinite period) or reassignment that would allow [it] to continue [Plaintiff's] employment." *Id.*

## V.      The litigation.

Plaintiff filed this action in July 2024. *See* Compl. In it, she brings claims for disability discrimination and retaliation under the ADA, *id.* at ¶¶ 41–66, disability discrimination and retaliation under the ORA, *id.* at ¶¶ 67–81, interference and retaliation under the FMLA, *id.* at 82–99, interference and retaliation under the OFLA, *id.* at ¶¶ 100–14, and an Oregon common law claim for wrongful discharge, *id.* at ¶¶ 115–24. Defendant now moves for summary judgment on each of those claims. *See* Mot.

### STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The moving party can meet that burden by showing that the nonmoving party cannot

"make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322–23. Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *FTC v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex Corp.*, 477 U.S. at 324).

The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001); *Green v. Frederickson*, 460 F. Supp. 3d 1079, 1083–84 (D. Or. 2020).

## DISCUSSION

**I.      Plaintiff's employment discrimination claim under the ADA and ORA.**

"The ADA and the ORA prohibit discriminating against qualified individuals on the basis of disability in the terms and conditions of their employment." *James v. Oregon Sandblasting & Coating, Inc.*, No. 3:15-cv-01706-HZ, 2016 WL 7107227, at *3 (D. Or. Dec. 4, 2016) (citing 42 U.S.C. § 12112(a), ORS § 659A.112(1)); *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (explaining that employers are prohibited from discriminating against a qualified individual with a disability because of that disability). The standards for analyzing claims brought under the ADA and ORA are the same. *See* ORS § 659A.139 (Oregon's disability antidiscrimination law is to "be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as

amended."). Accordingly, the Court uses the same analysis for Plaintiff's federal and state law disability discrimination claims.

To state a prima facie case for disability discrimination, a plaintiff "must show (1) that she is disabled within the meaning of the ADA; (2) that she is a qualified individual with a disability; and (3) that she was discriminated against because of her disability." *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013). If a plaintiff makes that showing, a court then applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1092–94 (9th Cir. 2001); *see also Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 943 (9th Cir. 2015) (applying the *McDonnell Douglas* burden-shifting framework to claims under Oregon disability law). Under that framework, an employer must then "provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action." *Mayo*, 795 F.3d at 944. "If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Id.* (citation modified). [5]

A.      **Whether Plaintiff could perform the essential functions of her job.**

Defendant argues that Plaintiff cannot establish a prima facie case for employment discrimination under the ADA or ORA because she could not perform the essential functions of her job and is therefore not a "qualified" individual under the statutes. Mot. 13–16. This Court disagrees.

---

[5] Based on Defendant's Motion, it is unclear whether it challenges Plaintiff's ability to show that its reasons for terminating Plaintiff were pretextual in the context of her discrimination claims, or solely in the context of her retaliation claims. *See, e.g.*, Mot. 19 (discussing Plaintiff's anticipated pretext argument). To the extent that Defendant raises that argument here, the Court rejects it for the same reasons discussed below with respect to the retaliation claims.

### 1.    Standards.

"A qualified individual with a disability is defined as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Smith*, 727 F.3d at 955 (citation modified) (quoting 42 U.S.C. § 12111(8)). A plaintiff bears the burden of proving that she is "qualified." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1086 (9th Cir. 2006).

A court first considers whether a plaintiff can perform the job's essential functions without reasonable accommodation; if not, the court considers whether the plaintiff can do so *with* a reasonable accommodation. *Id.* (citing *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1231 (9th Cir. 2003)). If the plaintiff cannot perform the essential function of the job at the time of the alleged discrimination, "then the ADA's employment protections do not apply." *Cripe v. City of San Jose*, 261 F.3d 877, 884–85 (9th Cir. 2001). But if the plaintiff can perform a job's essential functions—with or without a reasonable accommodation—then they are a qualified individual. *Id.*

"The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1) (emphasis in original). It "does not include the marginal functions of the position." *Id.* Regulations identify seven factors that can be used to evaluate whether a function is essential, including the: (1) "employer's judgment as to which functions are essential," (2) "written job descriptions," (3) "amount of time spent on the job performing the function," (4) "consequences of not requiring the incumbent to perform the function," (5) "terms of a collective bargaining agreement," (6) "work experience of past incumbents in the job," and (7) "current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3)(i)–(vii); *see also* 42 U.S.C. § 12111(8)

(explaining that "consideration shall be given to the employer's judgment as to what functions of a job are essential" and that a job description is evidence of a job's essential functions).

Although these factors are relevant, they are not dispositive: An employer cannot turn every condition of employment or job function into an *essential* job function "merely by including it in a job description." *See Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001). A plaintiff can therefore create a genuine issue of material fact by presenting evidence that only some of the listed tasks in a job description are essential functions. *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009) (explaining that diabetes did not prevent the plaintiff from performing the bulk of his "mostly office work job," but it did limit his participation in out-of-town assignments, and a dispute of fact remained over whether the latter was an essential function of his job).

### 2.    Analysis.

The question presented is whether Plaintiff could perform the essential functions of her position with a reasonable accommodation at the time of her termination. This Court concludes that Plaintiff has presented sufficient evidence to create a triable issue of fact on that issue.

Defendant presents evidence showing that it considers Plaintiff's in-person tasks to be essential functions of her job. For example, Defendant emphasizes responsibilities such as routing walk-in crisis patients, obtaining vital signs, conducting inventory of office supplies, and opening and closing the front door. Coles Decl. Ex. F at 3–4 (listing responsibilities in job description); *see also* Mot. 14–15 (discussing those responsibilities). And deposition testimony from Ms. Gray emphasized her belief that Plaintiff's in-person duties were essential functions of her job. *See, e.g.*, Coles Decl. Ex. D ("Gray Deposition") 26:22–27:8, ECF 35-1.

But a reasonable juror could find that Plaintiff could—and indeed did—perform the essential functions on her job when she worked remotely from her home. Plaintiff's evidence suggests that the essential functions of her job were computer-based tasks that she could perform either at the Arlington office or at her home. *See* Seelye Decl. ¶ 34. Client sign-ups were completed online, therapists escorted patients into treatment rooms, and scheduling and other matters were completed on her computer. *Id.* at ¶¶ 34–35, 39–42. A reasonable juror could conclude that other tasks, such as taking patient vitals or managing walk-in patients, were merely marginal functions given that they rarely—if ever—occurred. *Id.* at ¶ 43. *But see* First Seelye Dep. 76:11–77:2. And some basic tasks, such as unlocking and locking the front door each day, were carried out by the therapists that worked at the Arlington office simply depending on their schedule and preferences. *See* Seelye Decl. ¶¶ 25, 33.

Defendant cites *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237–39 (9th Cir. 2012), in support of its argument that Plaintiff's inability to work in-person entitles it to judgment as a matter of law. But that case, which concerned a neo-natal intensive care unit nurse who regularly exceeded a hospital's limit on unplanned absences, *id.* at 1235–36, underscores the factual disputes that remain here. There, the plaintiff acknowledged the in-person and physical nature of her position, as well as the negative impacts on teamwork and the hardships created when she could not be at work. *Id.* at 1238. But here, Plaintiff demonstrated that she could complete many tasks and received a positive performance evaluation during the period that she was allowed to work remotely. Bastian Decl. Ex. 11. Whether the remaining aspects of Plaintiff's work were "essential functions" of her job is therefore a question of fact for a jury to resolve. *See Rohr*, 555 F.3d at 864.

In sum, Defendant's Motion for Summary Judgment on this basis is DENIED.

PAGE 19 – OPINION AND ORDER

**B.    Whether a reasonable accommodation existed to allow Plaintiff to perform the essential functions of her role.**

Defendant argues that Plaintiff's failure to accommodate claims fail because Plaintiff cannot show a reasonable accommodation existed that would allow her to perform the job's essential functions. Mot. 16–19. This Court disagrees.

A plaintiff must show the existence of a reasonable accommodation that would have enabled them to perform the essential functions of a job. *Dark v. Curry Cnty.*, 451 F.3d 1078, 1088 (9th Cir. 2006) (citing *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1046 (9th Cir. 1999)). To avoid summary judgment, a plaintiff "'need only show that an "accommodation" *seems reasonable on its face*, i.e., ordinarily or in the run of cases.'" *Id.* (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002) (emphasis added)).

A defendant also has "an affirmative obligation to engage in an interactive process in order to identify, if possible, a reasonable accommodation that would permit [a plaintiff] to retain [their] employment." *Id.* If a defendant "did not engage in any such process, summary judgment is available only if a reasonable finder of fact *must* conclude that there would in any event have been no reasonable accommodation available." *Id.* (emphasis in original) (internal citation and quotation marks omitted).

A request to work remotely can—in some cases—be considered reasonable. *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). But ultimately, "[t]he reasonableness of an accommodation is a question of fact for the jury." *Ormsby v. Sunbelt Rentals, Inc.*, 205 F. Supp. 3d 1204, 1211 (D. Or. 2016) (citing *Dark*, 451 F.3d at 1088).

Defendant has not met the requirements for summary judgment. This Court first notes that Defendant has—at the very least—created an issue of fact as to whether it engaged in an interactive process. *See Witt v. Nw Aluminum Co.*, 177 F. Supp. 2d 1127, 1132 (D. Or. 2001).

PAGE 20 – OPINION AND ORDER

The record demonstrates that Ms. Gray regularly corresponded with Plaintiff about her condition, *see, e.g.*, Seelye Decl. ¶ 72; requested information from Plaintiff's doctor, Bastian Decl. Ex. 14 at 1–3; and Defendant accommodated Plaintiff's extended LWOP status while she sought treatment for her disability, Seelye Decl. ¶ 69. Accordingly, this Court does not analyze whether summary judgment is appropriate under the higher standard discussed above.

Nevertheless, Plaintiff has shown that her requested accommodation—working remotely—seems reasonable on its face. As explained above, Plaintiff has created a genuine issue of material fact as to the essential functions of her job. Thus, those aspects of the position that *were* in-person do not immediately disqualify Plaintiff's requested accommodationas unreasonable. And this Court concludes that Plaintiff has shown that her proposed work-from-home accommodation is reasonable on its face. Plaintiff had a proven record of successfully working from home for several months, *see, e.g.*, Bastian Decl. Ex. 11, which was a solution agreed to by her supervisors, Bastian Decl. Ex. 8; Seelye Decl. ¶ 55. Because remote work can be a reasonable accommodation in some situations, *see Humphrey*, 239 F.3d at 1137, the reasonableness of Plaintiff's proposed accommodation is an issue of fact for the jury.

In sum, Defendant's Motion for Summary Judgment on this basis is DENIED.

### C.     Whether Plaintiff's request for accommodation would cause an undue hardship.

Defendant argues that Plaintiff's request to work from home would cause an undue hardship. Mot. 19–20. This Court concludes that whether Plaintiff's requested accommodation would cause an undue hardship is a question of fact to be determined by a jury.

The ADA defines discrimination against a qualified individual to include failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . ., unless such covered entity can demonstrate that the

PAGE 21 – OPINION AND ORDER

accommodation would impose an undue hardship on the operation of the business. . . .” 42

U.S.C. § 12112(b)(5)(A); *see also Humphrey*, 239 F.3d at 1133 (discussing the statue).

“‘[U]ndue hardship’ means an action requiring significant difficulty or expense,” when

considered in light of several factors. 42 U.S.C. § 12111(10)(A); *see also Buss v. Peacehealth*,

No. 6:23-cv-01128-AA, 2026 WL 1256912 at *11 (May 7, 2026) (discussing that statute). The

factors to be considered include (1) “the nature and cost of the accommodation needed;” (2) the

overall financial resources of the facility, the number of persons employed, and the impact of

such accommodation on the facility; (3) the financial resources of the covered entity, its size with

respect to the number of employees, and the number and location of its facilities; and (4) the type

of operation of the covered entity. 42 U.S.C. § 12111(10)(B).

"Ordinarily, whether an accommodation would pose an undue hardship on the employer

is a factual question.” *Humphrey*, 239 F.3d at 1139. Indeed “the question whether someone can

perform the essential functions of a job is intertwined with the question whether an

accommodation that would permit an employee to perform the job is a ‘reasonable

accommodation’ that does not impose an ‘undue hardship.’” *Cripe*, 261 F.3d at 885 n.7. “These

questions are often inextricably linked because, under the ADA, when an employee needs an

accommodation to perform a job’s essential functions, the employee is a qualified individual . . .

only if the accommodation is reasonable and making the accommodation would not impose an

‘undue hardship’ on the employer.” *Id.*

Defendant primarily relies on the Arlington Clinic’s designation as an approved

Medicare provider in support of its argument that Plaintiff working from home would impose an

undue hardship. Mot. 19–20. Specifically, it points to a regulation requiring that the location be

“operational,” which entails being regularly staffed, open at its stated hours, and prepared to

deliver healthcare services. *Id.* (citing 42 C.F.R. §§ 424.502, 510 (a)(D)(3)–(8)). But there is nothing in those regulations that would lead to Defendant being entitled to judgment as a matter of law on what is otherwise an issue of disputed fact. *See* Def.'s Reply 7–8 (acknowledging that the regulations simply require that someone regularly open the office and arguing that Defendant intended for Plaintiff to fill that role). Viewed in the light most favorable to Plaintiff, the evidence—particularly Plaintiff's past experience working from home and the operational continuity that was achieved during that time—would allow a reasonable juror to find that working from home did not create an undue hardship for Defendant. Accordingly, this Court concludes that whether her requested accommodation creates an undue hardship for Defendant is a question of fact for the jury.

In sum, Defendant's Motion for Summary Judgment on that basis is DENIED.

### D.    Plaintiff's hostile work environment theory.

Plaintiff's Complaint alleges that Defendant discriminated against her under the ADA and ORA by creating a hostile work environment.[6] Compl. ¶¶ 44, 70. Defendant moves for summary judgment on that allegation, arguing that there is no evidence of a hostile work environment. Mot. 20–21. Plaintiff did not respond to Defendant's argument. Accordingly, this Court deems Plaintiff's hostile work environment allegation waived. *See Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (explaining that a nonmoving party waives an argument by failing to raise it in opposition to a motion for summary judgment). Defendant's Motion for Summary Judgment under that theory of liability is therefore GRANTED.

---

[6] Plaintiff also alleged a hostile work environment in her common law wrongful termination claim. Compl. ¶ 116. For the reasons described here, the Court also considers that allegation waived in that claim and grants Defendant summary judgment on that theory.

## II.    Plaintiff's retaliation claims under the ADA and ORA.

Defendant argues that Plaintiff's retaliation claim fails because she cannot show (1) a causal link between protected activity and her termination, and (2) that Defendant's reasons for her termination were pretextual. Mot. 22–24. This Court disagrees.

### A.    Standards.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Similarly, Oregon provides that "[i]t is an unlawful employment practice for an employer to discriminate against an individual with respect to hire or tenure or any term or condition of employment because the individual has applied for benefits or invoked or used the procedures provided for" under the ORA. ORS § 659A.109. As with claims for employment discrimination under the ADA and ORA, courts in Oregon analyze claims for retaliation under those statutes together and under a similar framework. *See, e.g.*, *Arnold v. Pfizer, Inc.*, 970 F. Supp. 2d 1106, 1140 (D. Or. 2013).

"To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) [they] engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004); *see also Arnold*, 970 F. Supp. 2d at 1140 (explaining that, under the ORA, a plaintiff must establish that they (1) invoked a right under the act, and (2) suffered an adverse employment action motivated in substantial part by that invocation). If an employee establishes a prima facie case, the burden shifts to the employer to offer a legitimate reason for the adverse

PAGE 24 – OPINION AND ORDER

action. *Pardi*, 389 F.3d at 849. At that point, "the burden shifts back to the employee to demonstrate a triable issue of fact as to whether such reasons are pretextual." *Id.*

When adverse employment actions closely follow invocations of protected rights, retaliatory intent may be inferred. *Id.* at 850; *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision."). The Ninth Circuit has found that a period of several months between a protected action and the retaliatory decision can allow causation to be inferred. *Yartzoff*, 809 F.2d at 1376 (noting that the adverse actions began three months after a complaint).

"[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of California Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000); *see also Shelley v. Geren*, 666 F.3d 599, 609 (9th Cir. 2012). A plaintiff's prima facie case may contain sufficient evidence to raise a genuine issue of material fact regarding the truth of an employer's proffered reasons. *Chuang*, 225 F.3d at 1127.

### B.     Analysis.

The Court finds that Plaintiff has produced sufficient evidence to defeat summary judgment. There is evidence from which a reasonable juror could find a causal link between her requests for accommodation and subsequent termination. And Plaintiff has produced evidence

PAGE 25 – OPINION AND ORDER

showing that Defendant's stated reasons for her termination—that she was no longer qualified for her position regardless of accommodations—were pretextual. Mot. 22–24.

First, Plaintiff has produced sufficient evidence to establish causation. Plaintiff's condition worsened in February 2023, and she requested a leave of absence. Lindsay Decl. Ex. C. After discussions spanning approximately two months, *see, e.g.*, Coles Decl. Ex. I (showing request for additional information from Plaintiff's doctor), including Plaintiff asking about her protections under the ADA, that request was approved, Seelye Decl. ¶¶ 66, 69. Plaintiff's request for further accommodation—permission to resume working from home per her doctor's recommendation—was submitted and considered by Defendant. Seelye Decl. ¶ 69–70. But it was ultimately denied, and Plaintiff was terminated. *See* Termination Letter. These events occurred over approximately three months. And given that temporal proximity, a reasonable juror could find that Plaintiff's termination was caused by her continued requests for accommodation.

Second, Plaintiff has presented sufficient evidence of pretext. Specifically, the evidence shows that Defendant's proffered explanation that Plaintiff was no longer qualified for her job, *see* Termination Letter ("Working from home is not a feasible option. . . ."), is internally inconsistent with its past actions in allowing her to work remotely. As discussed, Plaintiff previously worked remotely, completed her tasks, and otherwise met or exceeded her supervisor's expectations. *See* Bastian Decl. Ex. 11. Based on that evidence, a reasonable factfinder could disbelieve Defendant's explanation that working from home was no longer feasible. *See Chuang*, 225 F.3d at 1127.

The Court acknowledges Defendant's identified evidence suggesting that Plaintiff's work from home arrangement may have been time limited. *See* Bastian Decl. Ex. 8 (showing email directing Plaintiff to work with Ms. Fuentes "on what [she] could do at home and for how

PAGE 26 – OPINION AND ORDER

long"). But beyond that passing reference, and as described above, the evidence otherwise tends to show that Plaintiff's supervisors were satisfied with the arrangement, her performance, and were not imposing a time limit on the arrangement. That contradictory evidence creates a genuine issue of material fact that a jury must resolve.

In sum, Defendant's Motion for Summary Judgment on these claims is DENIED.

## III.    Plaintiff's FMLA claims.

Defendant argues that Plaintiff was not eligible for protected medical leave under the FMLA statute and that her claims therefore fail. Mot. 24–26.[7] This Court agrees.

29 U.S.C. § 2615(a)(1) makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" protected by the FMLA. *See Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (discussing the statute). "When a party alleges a violation of § 2615(a)(1), it is known as an 'interference' or 'entitlement' claim. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). Under 29 U.S.C. § 2615(a)(2), it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* at 777 (discussing the statute). "An allegation of a violation of this section is known as a 'discrimination' or 'retaliation' claim." *Id.*

Courts within the Ninth Circuit have held that only an "eligible employee" may bring a claim for FMLA retaliation. *See, e.g.*, *Lee v. Yellow Checker Star Transp. Taxi Mgmt.*, No. 2:23-cv-00919-APG-DJA, 2025 WL 1095017 at *1 (D. Nev. Apr. 10, 2025). An "eligible employee" is one who has been employed (1) for at least 12 months by the employer and (2) has at least

---

[7] Because this Court concludes that Plaintiff was not an eligible employee and her FMLA retaliation claim fails on that basis, it does not address Defendant's argument that she failed to show a causal link or pretext. *See* Mot. 26–27.

1,250 hours of service with that employer during the previous 12-month period. 29 U.S.C. § 2611(2)(A). And "[t]he FMLA states that an employer who violates 29 U.S.C. § 2615 'shall be liable to any *eligible* employee affected." *Lee*, 2025 WL 1095017 at *1 (emphasis added) (citing 29 U.S.C. § 2617(a)(1)). Because the FMLA does not make employers liable to non-eligible employees, "only eligible employees have a private cause of action for FMLA retaliation." *Id.* A similar analysis has been recognized for FMLA interference claims, and the first prong of an employee's prima facie case requires that they establish that they are "eligible for the FMLA's protections." *Sanders*, 657 F.3d at 778 (internal citation and quotation marks omitted).

Despite the allegations raised in the Complaint, *see* Compl. ¶¶ 87–89, Plaintiff now appears to concede that she was not an "eligible employee" under the FMLA. *See* Resp. 33, ECF 41 (framing her response as "[e]ven if Plaintiff was not formally eligible for FMLA"). Defendant repeatedly informed her that she had not worked sufficient hours to be covered by the FMLA, and she never disputed their calculation. *See* Seelye Decl. ¶¶ 49, 65. Accordingly, this Court concludes that Plaintiff is not an eligible employee under the FMLA, and Defendant is therefore entitled to summary judgment on those claims.

In sum, Defendant's Motion for Summary Judgment on Plaintiff's FMLA claims is GRANTED.

## IV.    Plaintiff's OFLA claims.[8]

Defendant argues that (1) Plaintiff was not eligible for OFLA protections and that her claim accordingly fails, and (2) Plaintiff failed to establish a causal link or pretext. This Court

---

[8] The allegations in Plaintiff's OFLA claim use interference, discrimination, and retaliation to describe Defendant's actions. Compl. ¶¶ 107–09. This Court therefore construes the Complaint as raising claims for OFLA interference and OFLA retaliation, which, as discussed below, are separate claims with distinct standards.

disagrees in part with Defendant's first argument but grants summary judgment on Plaintiff's

OFLA interference claim, and it concludes that Defendant failed to meet its burden for summary

judgment as to Plaintiff's OFLA retaliation claim.

### A.    Eligibility for OFLA.

Like its federal counterpart, OFLA defines which employees are covered by the statute's

protections. *See* ORS § 659A.156(1). Covered employees are those who (1) have been employed

for 180 days or more before the date on which leave would commence and (2) have worked an

average of more than 25 hours per week for that 180-day period. *Id.* And like its federal

counterpart, a claim for OFLA interference requires a Plaintiff to be eligible for OFLA's

protections. *See Hanson v. Oregon, Legislative Assembly*, No. 3:21-cv-780-SI, 2023 WL 22196,

at *19 (D. Or. Jan. 3, 2023). But unlike its federal counterpart, Oregon courts have concluded

that "an OFLA retaliation claim is not limited to an employee who is eligible for and has taken

OFLA-protected leave." *Yeager v. Providence Health Sys. Oregon*, 195 Or. App. 134, 140

(2004); *see also* OAR 839-009-0320(3) (stating that it is an unlawful practice to retaliate against

a person because they have "*inquired* about OFLA leave, submitted a request for OFLA leave or

invoked any provision of the Oregon Family Leave Act"). "After the decision in *Yeager*, OFLA

was amended" to include that protection, thereby codifying "the BOLI rule and the holding in

*Yeager*." *Hanson*, 2023 WL 22196, at *22 n.9 (discussing ORS § 659A.183(2), which provides

that "[i]t is an unlawful practice for a covered employer to . . . [r]etaliate or in any way

discriminate against an individual" because they have inquired about or otherwise invoked

OFLA).

As noted, Plaintiff now concedes that she was not eligible for OFLA's protections. Thus, she cannot establish the first prong of her prima facie case for her OFLA interference claim. Accordingly, Defendant's Motion for Summary Judgment on that claim is GRANTED.

Plaintiff's ineligibility for OFLA does not bar her OFLA retaliation claim. This Court follows state appellate court guidance when interpreting state law. *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). And Oregon courts have adopted a broad reading of the protections and public policy underlying OFLA, reasoning that it is intended to protect those who inquire about such leave, regardless of their eligibility. *See Cooper v. Rust*, 343 Or. App. 390, 395–96 (2025) (discussing the approach in *Yeager* and extending its reasoning to cover inquiries about sick leave), *review allowed*, 375 Or. 109 (2026). The Legislature's subsequent codification of protections for mere inquiries, *see* ORS § 659A.183(2), underscores the expansive approach. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's OFLA retaliation claim is DENIED.

### B.      Causal link and pretext.

Defendant argues that Plaintiff cannot establish a causal link between an inquiry about leave and her termination or show that its explanation is pretextual. Mot. 26–27. This Court concludes that Defendant has failed to show that it is entitled to judgment as a matter of law on Plaintiff's OFLA retaliation claim.

"An OFLA retaliation or discrimination claim . . . is most analogous to an FMLA interference claim." *Hanson*, 2023 WL 22196, at *23. To prevail on an OFLA retaliation claim, a plaintiff must show that the employer considered their "inquiries about or invocations of OFLA as a negative factor in any of the [employer's] adverse employment actions." *Id.* And notably, claims for FMLA interference—and thus OFLA retaliation—are not analyzed under a

PAGE 30 – OPINION AND ORDER

*McDonnell Douglas* burden shifting framework. *Id.* at *22 (collecting cases so holding); *see also Carter v. Fred Meyer Jewelers, Inc.*, No. 3:16-cv-00883-YY, 2019 WL 2744190, at *3–4 (D. Or. Apr. 10, 2019), *report and recommendation adopted*, 2019 WL 3206831 (D. Or. July 16, 2019). When the incorrect framework is raised and argued, a Court may deny a motion for summary judgment on that basis. *See, e.g.*, *Hanson*, 2023 WL 22196, at *23.

Because this Court construes Plaintiff's Complaint to bring a separate OFLA retaliation claim, it must analyze it according to the FMLA interference standards, which do not utilize a *McDonnell Douglas* burden shifting analysis. Defendant's Motion relies on the *McDonnell Douglas* analytical framework. *See* Mot. 26 (discussing causation and pretext). Because Defendant's Motion relies on the incorrect standards, the Court concludes that it has failed to show that it is entitled to judgment as a matter of law.

In sum, Defendant's Motion for Summary Judgment on Plaintiff's OFLA retaliation claim is DENIED.

## V.   Plaintiff's common law wrongful discharge claim.

Defendant argues that Plaintiff's wrongful termination claim fails because she has an adequate statutory remedy. Mot. 34. This Court agrees.

Under Oregon law, "an employer may discharge an employee at any time, for any reason, unless doing so violates a contractual, statutory or constitutional requirement." *Yeager*, 195 Or. App. at 141. "The tort of wrongful discharge provides an exception to this general rule." *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 (9th Cir. 2012). "An employee may bring a claim for wrongful discharge 'when the discharge is for exercising a job-related right that reflects an important public policy.'" *Id.* (citing and quoting *Yeager*, 195 Or. App. at 140).

Oregon courts impose an important limitation on such claims: an employee may not bring a "claim[] for common law wrongful discharge if there is an adequate statutory remedy." *Brown v. NW Permanente, P.C.*, No. 3:22-cv-986-SI, 2023 WL 6147178 at *6 (D. Or. Sept. 20, 2023). "The test for whether a claim for common law wrongful discharge is precluded requires a showing that either (1) an existing remedy adequately protects the public interest in question, or (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy." *Id.* Applying that test, courts in this district have held that a wrongful discharge claim based on disability discrimination is precluded by the availability of a claim under ORS § 659A.112. *See, e.g.*, *Wolff v. Tomahawk Mfg.*, 689 F. Supp. 3d 923, 951–52 (D. Or. 2023); *see also Brown* 2023 WL 6147178, at *6 (collecting cases and discussing preemption of the tort due to the availability of statutory remedies).

As in *Wolff*, this Court concludes that Plaintiff's wrongful discharge claim is precluded by the survival of her claim under the ORA, ORS § 659A.112. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's common law wrongful discharge claim is GRANTED.

## CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment, ECF 34, is GRANTED in part and DENIED in part. Defendant is entitled to summary judgment on Plaintiff's hostile work environment theory for liability under the ADA and ORA, her FMLA

PAGE 32 – OPINION AND ORDER

claim, her OFLA interference claim, and her Oregon common law wrongful termination claim. Defendant's Motion is denied as to Plaintiff's claims for employment discrimination and retaliation under the ADA and ORA, as well as her OFLA retaliation claim.

IT IS SO ORDERED.

DATED this 17th day of July, 2026.

_____
ANDREW HALLMAN
United States Magistrate Judge